UNITED STATES of America, Appellee,

v.

Stephen WILBUR, M.D., Appellant.

No. 94–4013.

United States Court of Appeals,
Eighth Circuit.

Submitted March 14, 1995.

Decided July 3, 1995.

William J. Mauzy, Minneapolis, MN, argued (Mark V. Meierhenry, Sioux Falls, SD, on the brief), for appellant.

Thomas J. Wright, Asst. U.S. Atty., Pierre, SD, argued, for appellee.

Before MAGILL, Circuit Judge, HEANEY, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

In mid–1994, Stephen Wilbur, a physician, was indicted on one count of acquiring morphine "by misrepresentation, fraud, ... deception, or subterfuge." *See* 21 U.S.C. § 843(a)(3). About four months later, a jury convicted him of that charge. He appeals, arguing that the evidence was insufficient to sustain his conviction. We agree; we therefore reverse the conviction and remand for the entry of a judgment of acquittal.

## I.

▐ To sustain a conviction under 21 U.S.C. § 843(a)(3), there must be evidence that "the defendant acquired ... the drugs in question *by misrepresentation, fraud, ... deception or subterfuge*" (emphasis in original). *United States v. Hill*, 589 F.2d 1344, 1351 (8th Cir.1979), *cert. denied*, 442 U.S. 919, 99 S.Ct. 2843, 61 L.Ed.2d 287 (1979). The focus of the statute is on "*how* [the] defendant obtained the drugs" (emphasis supplied). *Id.*

In other words, for Dr. Wilbur's conduct to be a violation of that particular statute, he must have made "a material misrepresentation, [or committed] fraud, deception, or subterfuge which [was] a cause in fact of the acquisition" of the morphine. *United States v. Bass*, 490 F.2d 846, 857 (5th Cir.1974); *see also id.* at 857 n. 11 ("[t]he statute explicitly includes an element of causation"). *See also State v. Seifert*, 354 N.W.2d 432, 432 (Minn. 1984), *cert. denied*, 469 U.S. 1112, 105 S.Ct. 794, 83 L.Ed.2d 787 (1985), construing the identical language of Minn.Stat.Ann. § 152.025.2(2)(i) (evidence sufficient to sustain conviction, since defendant obtained drugs "*through* intentional material misstatements and omissions of fact") (emphasis supplied); *Cronin v. State*, 678 P.2d 370, 373 (Wyo.1984), construing the identical language of Wyo.Stat. § 35–7–1033(a)(iii) (defendant was "not charged with fraud here—she [was] charged with acquiring ... a controlled substance *by means of* fraud") (emphasis supplied); *State v. Basinow*, 121 N.H. 815, 435 A.2d 829, 831 (1981) (*per curiam*), construing the identical language of N.H.Rev.Stat. Ann. § 318–B:2.V(a) ("the clear object of the statute is to proscribe the obtaining of controlled drugs *through* untruthfulness or nondisclosure") (emphasis supplied); *State v. St. John*, 544 S.W.2d 5, 8 (Mo.1976) (*en banc*), construing the identical language of Mo.Ann. Stat. § 195.204.1 ("[t]he intent and purpose" of the statute are to forbid "the obtaining of narcotic drugs *through* any form of untruthfulness, deception or nondisclosure") (emphasis supplied); and *State v. Livingston*, 2 Or. App. 587, 469 P.2d 632, 634 (1970), construing the identical language of Or.Rev.Stat. § 475.994(1)(c) ("the object of the statute is to proscribe the obtaining of narcotic drugs *through* any untruthfulness or nondisclosure") (emphasis supplied).

▐ The indictment charged Dr. Wilbur with acquiring the morphine between October 17 and October 20, 1993. Dr. Wilbur admitted that he took morphine from one patient's IV bag on "five separate occasions" between October 17 and October 20, 1993. He did not, however, state when those "specific times" were.

The evidence showed that on October 20, the patient's family visited the patient but left about 8:00 p.m. A nurse hung an IV bag containing morphine solution for the patient shortly after the family left. Within an hour of that time, Dr. Wilbur (who was the patient's treating physician) went into the patient's room and closed the door. The evidence was further that at some point after Dr. Wilbur went into the patient's room, a nurse knocked on the door and asked if there was anything she could help him with; he responded "[N]o"—that he "was just going to

visit with [the patient] for a while." The nurse then closed the door again. Sometime during that visit, Dr. Wilbur withdrew some of the morphine solution with a syringe. There was no testimony about whether Dr. Wilbur took the morphine solution before or after the nurse's inquiry.

We agree with Dr. Wilbur that the evidence with respect to the events of October 20, 1993, is insufficient to sustain his conviction. The testimony was that the patient's family had already left and that Dr. Wilbur spoke neither to the family nor to the nurse before he went into the patient's room. After he went into the patient's room, he told a nurse that he did not need any help. In short, he acquired the morphine on that occasion without having attempted to induce anyone to leave him alone in the patient's room—*i.e.,* without having resorted to any trickery in order to obtain the drug.

A nurse also testified that "a few days" before October 20, Dr. Wilbur was spending "a lot of time" with the patient. The nurse testified, with respect to that period, that on "another morning," Dr. Wilbur suggested to the patient's wife that she should "go have coffee" while he "checked over" the patient. At the time of that conversation, the patient's wife was "in the hallway." There was no testimony, however, either that Dr. Wilbur took morphine during that specific visit or, even, whether that specific day was October 17, 1993, or later.

"While reasonable inferences from the evidence weigh against the defendant, speculation does not." *United States v. Pace,* 922 F.2d 451, 453 (8th Cir.1990). Even if we were to conclude that Dr. Wilbur induced the patient's wife to leave him alone in the patient's room at that time, our view is that it would require speculation to decide, beyond a reasonable doubt, either that "a few days" before October 20 included October 17 or later, or that Dr. Wilbur took morphine from the patient during that particular visit.

## II.

Dr. Wilbur did a reprehensible thing, from both a legal and a moral standpoint—let there be no doubt about that. The government charged him, however, not with theft, conversion, or embezzlement, but with acquiring drugs by misrepresentation, fraud, deception, or subterfuge. There is simply no evidence of trickery that allowed his acquisition of morphine during the period specified in the indictment. For that reason, we reverse his conviction and remand the case for the entry of a judgment of acquittal with respect to this charge.

MAGILL, Circuit Judge, dissenting.

I respectfully dissent, and would not disturb the jury's verdict. Wilbur has failed to show that the evidence presented to the jury was insufficient to support a verdict of guilty on the charge of acquiring morphine by misrepresentation, fraud, deception, or subterfuge.

When a defendant argues that the evidence presented at trial was insufficient to sustain his conviction, we review the evidence in the light most favorable to the jury's verdict, making all reasonable inferences in support of that verdict. *United States v. Agofsky,* 20 F.3d 866, 869 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 363, 130 L.Ed.2d 316 (1994). We must sustain the verdict if there is substantial evidence to support it, *id.,* and we will reverse only if "no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Frayer,* 9 F.3d 1367, 1371 (8th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 77, 130 L.Ed.2d 31 (1994).

In *United States v. Bass,* 490 F.2d 846 (5th Cir.1974), *other aspects overruled by United States v. Lyons,* 731 F.2d 243, 246 (5th Cir. 1984) (en banc), defendant was charged, under 21 U.S.C. § 843(a)(3), with illegally obtaining prescription drugs. The government presented evidence that Bass had obtained prescriptions from two different doctors on the same day, without telling either doctor of the other prescription. *Id.* In finding that the government had not proven the causation element of the offense, the court said:

[T]he criminal offense created by 21 U.S.C. § 843(a)(3) requires more than the fact of concealment. We read this statute to require a material misrepresentation, fraud, deception, or subterfuge which is a cause

in fact of the acquisition of a controlled substance. In this case, the government elicited testimony neither as to the concealment's materiality nor as to its effect on the prescribing doctors' actions.

*Bass,* 490 F.2d at 857 (footnote omitted). The only testimony as to materiality or effect was one doctor's response to the question of whether he would have given the prescription had he known that defendant had received another prescription that same day. The court held that the doctor responded that "[t]his would depend on whether or not I had examined the patient and felt that he had needed it." *Id.* This testimony indicated that the defendant's failure to inform the doctor of the previous prescription had no material effect on the doctor's decision to prescribe.

I do not take issue with the majority's reliance on this and other cases stating a causation requirement under § 843(a)(3). In the instant case, however, there was ample testimony from which the jury could reasonably find that Wilbur engaged in deception or subterfuge in order to induce both the nurse who assisted him in the care of the patient, and the patient's family, to leave him alone with the patient, at which time he would extract morphine from the patient's IV bag. This sequence of events constitutes the "cause in fact" required in *Bass;* but for the absence of the nurse and the patient's family, Wilbur could not have surreptitiously extracted morphine from the IV bag.

The indictment, in relevant part, alleges that Wilbur "[o]n or between October 17, 1993, and October 20, 1993 ... did knowingly and intentionally acquire and obtain possession of morphine sulfate, a Schedule II controlled substance, by misrepresentation, fraud, forgery, deception, and subterfuge...." Testimony at trial indicated that Wilbur used misrepresentation, deception, and subterfuge to ensure that the assisting nurse would leave him alone in the room. He also, starting on October 4 and continuing through October 20, established a pattern of using subterfuge to induce the patient's family to leave the room when Wilbur entered it.

The nurse who assisted in the care of the patient, Cecelia Meyers, testified that, a few days before October 20, Wilbur was spending "a lot of time" with the patient. I Trial Tr. at 41. She also testified that, one morning after Wilbur had asked the patient's wife to leave while he checked the patient, Meyers offered to stay and help, but Wilbur declined her help, and closed the door. *Id.* In addition, the patient's wife testified that Wilbur generally came to see her husband without a nurse. *Id.* at 98.

The patient's wife testified that she visited her husband every day while he was in the hospital, starting on October 4, when he entered the hospital. *Id.* at 97. She testified that every time Wilbur appeared, which was "very often," he would ask her to leave the room, saying that he wanted to talk with patient alone. *Id.* at 101. This is supported by the nurse's testimony that one morning she was present when Wilbur told the patient's wife to go have coffee while he checked the patient. *Id.* at 41. After a few such incidents, the wife testified, she began "automatically" to leave the room whenever Wilbur appeared, because she "expected that's what we should do," and because she "thought it was confidentiality between patients and doctor." *Id.* at 98, 101. This was the pattern from the time her husband entered the hospital throughout the month of October. *Id.* at 102.

The patient's daughter's testimony was consistent with her mother's. She testified in addition that her father never asked her or her mother to leave the room, and that the other attending physicians did not ask her or her mother to leave the room. II Trial Tr. at 142. Another nurse at the hospital testified that it was ordinarily Wilbur's policy to allow the family to decide whether they wanted to remain in the room during examinations. *Id.* at 155.

Things came to a head on October 20. Meyers testified that around 8 p.m., she hung a fresh bag of morphine for the patient's IV. I Trial Tr. at 31. About forty-five minutes later, she noticed that the door to the patient's room was closed. This was unusual, so she knocked on the door. Wilbur was alone in the room with the patient, and Meyers asked him if there was anything she could help him with. He answered no, and

that he was just visiting with the patient. Meyers told him she was available if he needed her, closed the door, and returned to her desk. *Id.* at 33–35.

Around 9:20 p.m., Meyers went to check on the patient again. Wilbur was no longer in the room, and she noticed that the morphine bag was down to 100 cc's, although there should have been at least 200 cc's remaining in the bag she had hung around 8 p.m. *Id.* at 36. She was immediately concerned for the patient, so she turned off the morphine drip and examined him. His vital signs were fine, and he showed no unusual symptoms. *Id.* at 36–37. She then checked the IV bag and pump for leakage or malfunction, finding none. *Id.* at 37. She brought some registered nurses from another ward to check the patient and equipment, and they, too, found no abnormalities. *Id.* at 38.

She called Wilbur at home to inform him of these events, and told him that she was sure that the missing morphine had not gone into the patient, and that she simply could not account for it. He told her to add some morphine to the bag. She told him that she would fill out an "incident report" for him to see in the morning. *Id.* at 39–40. After investigating patterns of controlled substances missing at the hospital, DEA investigators interviewed Wilbur on December 9, 1993. *Id.* at 67–69. Confronted with evidence of morphine missing from the patient's IV bag between October 17 and 20, Wilbur confessed to taking morphine from the bag five separate times between those dates. *Id.* at 79–80.

"[A] fact in issue in a criminal case, including criminal intent and the ultimate fact of guilt or innocence of a criminal charge, may be proved by circumstantial as well as direct evidence." *United States v. Hill,* 589 F.2d 1344, 1349 (8th Cir.) (quoting *United States v. Wisdom,* 534 F.2d 1306, 1309 (8th Cir. 1976)), *cert. denied,* 442 U.S. 919, 99 S.Ct. 2843, 61 L.Ed.2d 287 (1979). The testimony outlined above supports the reasonable inference that, starting on October 4, Wilbur created an ongoing deceptive scheme to ensure that he would have opportunities to be alone in the patient's room, and that on October 20, as part of this scheme, Wilbur used subterfuge or deception to induce Meyers to leave him alone in the room so that he could extract morphine from the patient's IV bag.

The testimony, examined in the light most favorable to the verdict, states that Wilbur, falsely implying that it was necessary for him to be alone with the patient, established a rule that the patient's family would leave the room when he came to see the patient. This was so firmly established that the family would leave automatically when Wilbur appeared, and this pattern continued throughout the month of October. Further, the testimony states that the nurse repeatedly offered her help with the patient to Wilbur, and this help was rejected. It was thus reasonable for a jury to find that Wilbur: (1) created a scheme in which he induced, through the subterfuge of implied confidentiality requirements, family members to leave the patient's room when he showed up; (2) exercised this scheme throughout the entire period from October 4 to October 20; (3) was "very often" seen at the patient's room by the family and by the attending nurse; and (4) took morphine from the room at five different times during the three days between October 17 and 20. Although it is a close question, this is sufficient evidence to meet the causation requirement of § 843(a)(3). A jury could reasonably infer from this evidence that, at some time between October 17 and 20, Wilbur took morphine from the patient's IV during one of those "confidential" patient checks for which the family members automatically left the room.

Even more clearly, however, the incidents of October 20 support a jury verdict of guilty. The majority, in its focus on Wilbur's scheme to induce the *family* to leave the room, neglects to examine closely the events of October 20. On October 20, Meyers entered the room because she did not know why the door was closed. It was unusual for the door to be closed, and she felt that she should investigate. The majority states that Wilbur did not speak to the nurse before going into the patient's room, and this is true, but does not discuss the brief conversation Wilbur had with Meyers when she went to see why the door was closed. According to Meyers, Wilbur stated that he did not need help and,

implying that this was *why* he did not need help, that he was "just visiting" with the patient. Less than an hour later, Meyers discovered that morphine was missing. From this single sequence of events, a reasonable jury could find: (1) that Wilbur misrepresented his activities in the room by stating that he was "just visiting" with the patient; (2) that the patient's door was ordinarily open when a doctor was not examining the patient; (3) that as a direct result of Wilbur's misrepresentation, Meyers left him alone in the room with the door closed; (4) that he could not have taken morphine from the IV had the door been open or had Meyers been in the room; and (5) that he took morphine from the IV after Meyers left the room. Thus, the jury could have found that Wilbur's lie, that he was "just visiting" with the patient, was the cause in fact of his remaining alone in the room with the door closed, and thus the cause in fact of his obtaining morphine from the patient's IV on October 20.

Because the events of the evening of October 20 constitute sufficient evidence for a jury to convict Wilbur of obtaining morphine by misrepresentation, deception, and subterfuge, I respectfully dissent.