**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3174
_____

UNITED STATES OF AMERICA

v.

KASHON ADADE, a/k/a Key

Kashon Adade,
                              Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 2-11-cr-00467-001)
District Judge: Hon. Timothy J. Savage
_____

Submitted Under Third Circuit LAR 34.1(a)
November 15, 2013
_____

Before: HARDIMAN, SHWARTZ, and SCIRICA, Circuit Judges.

(Filed: November 19, 2013)
_____

OPINION
_____

SHWARTZ, Circuit Judge.

Defendant Kashon Adade appeals two of his drug convictions, arguing that the

evidence was insufficient to sustain them. For the reasons set forth herein, we will

affirm.

I.

As we write principally for the benefit of the parties, we recite only the essential facts and procedural history. Between 2007 and 2011, Adade was involved in bank fraud and prescription drug schemes with Samyre Washington. Adade and Washington considered each other "brothers" and resided together in a two bedroom house along with their girlfriends and children. Washington and his girlfriend, Shalita Baker, shared the back bedroom, and Adade and his girlfriend shared the other bedroom.

As part of the bank fraud scheme, Adade and Washington recruited individuals to open bank accounts and turn over the account documents and debit cards to them. Adade and Washington then deposited, or directed others to deposit, checks drawn on closed accounts or accounts with insufficient funds into the newly opened accounts, and then withdrew money from the accounts or conducted check card transactions before the bank determined that the checks were unfunded.

Around the same time, Adade and Washington were also involved in a prescription drug scheme whereby they recruited individuals to provide their health insurance cards and then arranged for others to use those cards at various pharmacies to fill fake prescriptions for oxycodone.[1] Several of the individuals who participated in the bank fraud scheme also provided their health insurance cards and filled oxycodone

---

[1] Oxycodone is a Schedule II controlled substance. 21 U.S.C. § 812; 21 C.F.R. § 1308.12.

prescriptions. Washington then sold the oxycodone pills illegally outside the home he shared with Adade.

Searches of Adade and Washington's trash on June 7 and 10, 2011 and home on June 13, 2011 revealed checkbooks, debit cards, driver's licenses, health insurance cards, prescription pads, written prescriptions, empty prescription bottles for oxycodone, and approximately 900 oxycodone pills. Most of this evidence, including the 900 pills, was found in Washington's bedroom closet.

A grand jury returned a twenty-one count indictment charging Adade with crimes arising from the bank fraud and prescription drug schemes. At the close of the government's case, the government moved to dismiss Counts 12 and 20, and nineteen counts remained. At the close of the evidence, Adade moved for a judgment of acquittal on Count 13 (possession of access device-making equipment), Count 14 (conspiracy to distribute oxycodone), Counts 15, 16, and 17 (possession of oxycodone with intent to distribute), and Counts 19 and 21 (acquiring oxycodone by fraudulent means).[2] The government agreed that Counts 15, 16, and 17 should be dismissed. After hearing argument, the District Court dismissed Counts 15, 16, and 17, but denied Adade's motion to dismiss the other counts.

---

[2] Adade did not move for a judgment of acquittal on Counts 1 through 11 (related to bank fraud and aggravated identity theft) or Count 18 (conspiracy to acquire oxycodone through fraudulent means), conceding that there was sufficient evidence to convict him on those counts.

Adade was found guilty on all counts with the exception of Count 13 (possession of access device-making equipment) and Count 21 (acquiring or obtaining possession of a controlled substance by fraudulent means between March 2010 and January 2011). In his post-trial motion, Adade again argued that the evidence was insufficient to support his conviction for conspiracy to distribute oxycodone (Count 14) and acquiring 900 oxycodone pills by fraud on or about June 13, 2011 (Count 19). The District Court denied Adade's motion and sentenced him to 99 months of imprisonment followed by three years of supervised release. This appeal followed.

## II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. We apply a deferential standard when deciding if a jury verdict rests on sufficient evidence and we do not weigh the evidence or determine credibility of the witnesses. United States v. Bansal, 663 F.3d 634, 665 (3d Cir. 2011). Rather, we "view the evidence in the light most favorable to the government, and we will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (internal quotation marks and citations omitted).

## III.

Adade appeals his convictions for: (1) conspiracy to distribute oxycodone, as charged in Count 14, and (2) acquiring or obtaining possession of oxycodone by fraudulent means, as charged in Count 19.

4

## A.

Adade argues that the evidence at trial was insufficient to sustain his conviction for conspiracy to distribute oxycodone. Specifically, he argues that while there is evidence of his recruitment of people to provide their health insurance cards and fill prescriptions, there is no evidence that he was involved in the creation of fraudulent prescription forms or packaging the oxycodone tablets for distribution, and asserts that most of the evidence, including the 900 oxycodone pills, was discovered in Washington's bedroom closet. While he concedes that there was sufficient evidence to convict him for conspiracy to acquire oxycodone (Count 18), he asserts that there was insufficient evidence to convict him of conspiracy to distribute it.

To prove that Adade conspired to distribute a controlled substance in violation of 21 U.S.C. § 846, the government must prove: (1) two or more persons agreed to distribute a controlled substance; (2) Adade was a member of that agreement; and (3) Adade joined the agreement knowing its objective was to distribute a controlled substance. See United States v. Cartwright, 359 F.3d 281, 287 (3d Cir. 2004), abrogated on other grounds by United States v. Caraballo-Rodriguez, 726 F.3d 418, 431-32 (3d Cir. 2013). As it relates to the agreement, the government must establish "(1) a shared unity of purpose [between the alleged conspirators], (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal, which [defendant] knowingly joined." United States v. Boria, 592 F.3d 476, 481 (3d Cir. 2010). Because the government may prove a conspiracy by circumstantial evidence, "the existence of a

5

conspiracy can be inferred 'from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding.'" United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986) (quoting United States v. Ellis, 595 F.2d 154, 160 (3d Cir. 1979). The government does not need to prove that each defendant knew all of the conspiracy's details, goals, or other participants. See United States v. Theodoropoulos, 866 F.2d 587, 593 (3d Cir. 1989), overruled on other grounds by United States v. Price, 76 F.3d 526, 528 (3d Cir. 1996).

The evidence established that Adade and Washington were like brothers, lived together, and had worked together to commit bank fraud. Moreover, the evidence showed that Adade and Washington had obtained the health insurance cards of numerous individuals—many of whom were individuals Adade had recruited to participate in the bank fraud scheme. The cards were used and intended to be used to create false prescriptions for oxycodone in the names of these individuals and to obtain the oxycodone from pharmacies. Baker specifically testified that Adade provided Washington with health insurance cards, and in return, Adade did not have to pay rent. Moreover, the evidence also established that: (1) Adade and Washington were present when at least some of these prescriptions for oxycodone were filled, (2) Washington bagged the pills into smaller quantities and illegally sold them, and (3) health insurance cards, driver's licenses, blank prescription pads, and empty prescription bottles for

6

oxycodone were found in different parts of the house that Adade and Washington shared, and 900 pills were specifically found in Washington's bedroom closet.

Based upon this evidence, a reasonable trier of fact could conclude that Adade and Washington "shared [a] unity of purpose" of securing oxycodone for sale on the street and had "an agreement to work toward that goal." Boria, 592 F.3d at 481. Given the volume of health insurance cards, prescription pads, and pills found in the house, as well as the testimony concerning Adade's solicitation of individuals to borrow their health insurance cards to obtain oxycodone from pharmacies, a rational trier of fact could conclude that Adade was aware that oxycodone was secured for distribution and not acquired simply for personal use. Indeed, Baker testified that when she handed over her insurance card, she understood that Washington was going to use it to purchase oxycodone from the drugstore and then sell it. It was reasonable for the jury to infer that Adade, who also lived in the house and secured health insurance cards that were used for the same purpose, would have a similar understanding when he engaged in acts that facilitated the procurement of oxycodone.

Therefore, while there was no direct evidence that Adade created fake prescriptions or distributed the pills, there was sufficient evidence for a jury to find that Adade participated in a conspiracy to distribute oxycodone.

B.

Adade argues that the evidence at trial was insufficient to sustain his conviction for acquiring or obtaining possession of oxycodone by fraudulent means. Adade asserts

7

that there was no evidence that he prepared the fake prescriptions or ever entered a drugstore to obtain the pills. All of the oxycodone pills were found in Washington's bedroom closet, and hence Adade claims there is no proof he acquired the oxycodone or had actual possession of the oxycodone.[3]

Section 843(a)(3) makes it unlawful to "knowingly or intentionally . . . acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge." 21 U.S.C. § 843(a)(3).[4] To sustain a conviction under Section 843(a)(3), there must be evidence upon which a reasonable juror could find beyond a reasonable doubt that Adade "acquired . . . the drugs in question by misrepresentation, fraud, . . . deception or subterfuge," and therefore "[t]he focus of the statute is on how [Adade] obtained the drugs." United States v. Wilbur, 58 F.3d 1291, 1292 (8th Cir. 1995) (emphasis omitted) (internal quotation marks omitted). The misrepresentation or fraud must be a "cause in fact of the acquisition" of the oxycodone pills. United States v. Bass, 490 F.2d 846, 857 (5th Cir. 1974), overruled on other grounds by United States v.

---

[3] Notably, however, he concedes that there is sufficient evidence to support his conviction for conspiracy to fraudulently acquire oxycodone (Count 18).

[4] A defendant may violate Section 843(a)(3) by two different acts: "acquir[ing]" a controlled substance or "obtain[ing] possession of" a controlled substance. The statute does not define "acquire," and in the absence of any special meaning, the ordinary meaning of the word should be used. "Acquire" means, among other things, "to get by one's own efforts." The American Heritage Dictionary 15 (4th ed. 2009); see also Black's Law Dictionary 26 (9th ed. 2009) ("to get or obtain"); Merriam-Webster's Collegiate Dictionary 11 (11th ed. 2005) ("to get as one's own"). Because we find there was sufficient evidence of his acquisition of the pills, we need not determine whether he obtained possession of them.

8

Lyons, 731 F.2d 243, 246 (5th Cir. 1984); see also Bass, 490 F.2d at 857 n.11 ("The statute explicitly includes an element of causation.").

Here, there was evidence that Adade secured the health insurance cards for presentation to the pharmacies, which enabled him to acquire the oxycodone by illegal means. For example, as stated previously, Baker testified that Adade provided Washington with the health insurance cards of others in exchange for living rent-free in the house they shared. Moreover, Edward Watson, an individual whom Adade recruited to help in both the bank fraud and prescription drug schemes, testified that he was driven to a pharmacy with Washington and Adade in the car, Washington asked him to fill a prescription in Adade's presence, and when he came back to the car with the oxycodone, he gave it to either Washington or Adade, but he could not recall which one of them. Furthermore, others testified that Adade asked for their health insurance cards, and the searches of Adade's house and trash revealed empty prescription bottles for oxycodone bearing the names of individuals with whom Adade committed bank fraud and/or who provided Adade their health insurance cards. Taken as a whole, this was sufficient evidence for a rational trier of fact to conclude that Adade used others to acquire a controlled substance.

The evidence also showed that Adade made "a material misrepresentation, [or committed] fraud, deception, or subterfuge" that enabled him to acquire the pills. Wilbur, 58 F.3d at 1292 (alterations in original) (quoting Bass, 490 F.2d at 857). Adade recruited individuals, many of whom also partnered with him in the bank fraud scheme,

9

to provide him with their health insurance cards to be used to fill prescriptions not meant for them.  This deceived the pharmacies, as they relied upon a prescription stating the pills were for the individual who presented the prescription when in fact the pills were procured for distribution to others.  Therefore, there was sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that this deception enabled Adade to acquire oxycodone from the pharmacies by fraudulent means.

IV.

For the foregoing reasons, we will affirm Adade's convictions for conspiracy to distribute oxycodone and acquiring or obtaining possession of oxycodone by fraudulent means.