RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0221p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JORDIE L. CALLAHAN (14-3772); JESSICA L. HUNT (14-3771),

*Defendants-Appellants.*

Nos. 14-3771/3772

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:13-cr-00339—Benita Y. Pearson, District Judge.

Argued: August 6, 2015

Decided and Filed: September 8, 2015

Before: CLAY and SUTTON, Circuit Judges; WATSON, District Judge.[*]

———————————

**COUNSEL**

**ARGUED:** Edward G. Bryan, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant in 14-3771. Chelsea S. Rice, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Edward G. Bryan, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant in 14-3771. Donald Butler, Cleveland, Ohio, for Appellant in 14-3772. Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

———————————

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

1

---

**OPINION**

---

CLAY, Circuit Judge.   Defendants Jessica Hunt and Jordie Callahan appeal their convictions and sentences for conspiracy, in violation of 18 U.S.C. § 371; forced labor, in violation of 18 U.S.C. §§ 1589(a) and 2; and acquisition of a controlled substance by deception, in violation of 21 U.S.C. § 843(a)(3).   After a twelve-day trial, the jury found Defendants guilty of the aforementioned offenses.   The jury also found that each forced labor violation included the offense of kidnapping or attempted kidnapping within the meaning of 18 U.S.C. § 1589(d).   The district court denied Defendants' motions for acquittal and a new trial and sentenced them to lengthy terms of imprisonment.   For the reasons that follow, we AFFIRM.

**BACKGROUND**

**I.       Statement of Facts**

The evidence presented at trial told the story of two vulnerable individuals—S.E., a developmentally-disabled young woman, and her minor daughter, B.E.—held in subhuman conditions and subjected to continual and prolonged abuse.

S.E. has a documented history of cognitive impairment, and she and B.E. struggled to eke out an existence at the margins of society.   When S.E. turned eighteen, she was kicked out of her mother's house.   She did not have a relationship with her biological father, and she had no family members willing to take her in.   S.E. moved frequently and was often homeless.   She relied on her social security benefits and other government assistance to survive and care for her daughter.

S.E. became acquainted with Defendants through their mutual association with a group of people in their small town who abused narcotics and shoplifted together.   On one occasion, S.E. was arrested for shoplifting and spent several weeks incarcerated.   When she was released from jail in May 2010, she agreed to move in with Defendants because she had no other place to stay. Shortly thereafter, she regained custody of B.E., who was then three years old.

Defendants lived in Apartment 2 of a building that contained three units. Although S.E. and B.E. initially lived with Defendants as traditional roommates, the relationship quickly deteriorated. Defendants forced S.E. to clean the apartment, do yardwork, care for their dogs, and run various errands for them. Defendants also forced S.E. and B.E. to sleep in the unfinished basement of the apartment, and later, in a sparsely furnished upstairs bedroom. Both rooms locked from the outside, and Defendants confined S.E. and B.E. to these rooms at night. Because S.E. did not have access to the lavatory when she was locked in these rooms, she was forced to soil herself or relieve herself on the floor. In one instance that S.E. soiled herself, Hunt forced her to smear the feces on her face.

Defendants would let S.E. out of the locked room in the morning, on the condition that she do their bidding. She was forced to work from morning until night, and there was witness testimony that S.E. was constantly cleaning the apartment, often while Defendants sat and watched. On one occasion, Defendants' drug dealer saw S.E. performing maintenance work on the building, and Hunt told the drug dealer that S.E. had better do the work "if she knows what's good for her." S.E. complied with Defendants' demands because she believed they would physically assault her, as they had done in the past.

Defendants also forced S.E. to care for their dogs. S.E. had to feed the dogs and take them for walks individually. She also had to clean up after the dogs when they urinated or defecated in the house. There were numerous occasions when Hunt grabbed S.E. by the hair and shoved her face in dog urine and feces if she did not clean up the messes quickly enough. Witnesses testified that S.E. seemed terrified and that Callahan boasted that it was S.E.'s job to clean everything and keep the house tidy. Defendants also allowed the dogs to abuse S.E. and B.E.

It apparently was also S.E.'s job to run errands for Defendants. They forced her to go to a nearby convenience store and purchase cigarettes, candy, and soda for them. They imposed strict time limits for these trips and warned S.E. not to talk to anyone while she was out. If S.E. exceeded the time limit or Defendants suspected that she had talked to anyone, she was punished. One on occasion when S.E. exceeded Defendants' time limit, Callahan interrogated S.E. while forcing her to submit to "five finger fillet"—a "game" wherein S.E. spread her fingers

and laid her hand on a table, and Callahan stabbed back and forth between her fingers with a knife. On another occasion when S.E. took too long to run an errand, Callahan threatened B.E. at gunpoint. S.E. was also punished if she purchased items that were not on Hunt's shopping list, with Hunt punching S.E. in the face or otherwise striking S.E. in the head on such occasions. All of these ways Defendants used to control S.E. and B.E. had their intended affect—both victims were terrorized.

When S.E. and B.E. were forced to live in the basement, they slept on the concrete floor and only had the clothes they were wearing and blankets covered in filth to keep warm. The cold, rank basement environment was especially hard on B.E., whose face would turn ghostly white because of the cold; S.E. would give B.E. her sweater to wear and hold B.E. close to her chest to keep her warm. Defendants rarely allowed S.E. and B.E. to shower or bathe. Witnesses reported that S.E. often appeared unclean and sickly, emitted a foul odor, seemed fearful, and had bruises on her body.

Defendants would let S.E. out of the basement in the mornings, but forced B.E. to stay there while S.E. performed the work they required of her. S.E. thought about running away to her mother's house while on an errand, but because Defendants kept B.E. locked in the basement while S.E. was working, S.E. never acted on that desire. Defendants also forbade S.E. from eating or feeding B.E. until she returned to the basement at night after completing all assigned tasks. S.E. and B.E. typically ate one meal a day, and their diet generally consisted of unheated canned food, bread, and unrefrigerated lunch meat. Defendants would leave S.E. and B.E.'s food for the evening on the steps leading into the basement, and Hunt beat S.E. when S.E. tried to take food from the refrigerator.

B.E. was not immune from abuse—one of Hunt's sons tied her up with rope and kept her bound all night because she tried to drink a soda that was not intended for her. Defendants also beat B.E. themselves. Although she was a toddler, they struck her on numerous occasions for soiling herself. Hunt's sons also assaulted B.E. on various occasions, and Callahan once threw a snake on her.

Callahan also punished S.E. by putting a dog collar around her neck, forcing her into the cage for the dogs, and ordering her to eat dog food. One of Hunt's sons shot S.E. multiple times

with a BB gun for disobeying an order. Daniel Brown, an indicted co-conspirator, also helped Defendants assault and humiliate S.E. when they discovered that S.E. planned to escape. Brown shaved S.E.'s head, wrote degrading obscenities on her face, and slammed her head into a kitchen sink. Callahan and Hunt supplemented this humiliation and abuse by kicking S.E. in the face and throwing a soda bottle at her.

Defendants also ordered S.E. to beat B.E., and they recorded these beatings on their cell phones. Brown was also present on a few of these occasions and recorded the beatings on his phone as well. Defendants threatened to show the videos to law enforcement if S.E. ever failed to follow their orders or "snitched" on them. They often threatened S.E. with the prospect of having her daughter taken away from her.

S.E. and B.E. managed to escape from the basement one night by accessing another apartment that also led to the basement and exiting through that apartment to walk to S.E.'s mother's house. Upon learning of the escape, Defendants enlisted Brown to bring S.E. back to their home under the guise of a trip to an ice cream parlor. Hunt then told S.E. that if she returned to her mother's house, her mother would call Children's Services and report that S.E. had been abusing her daughter. Unsure what to do, S.E. and B.E. reluctantly returned to Defendants' apartment.

Defendants abused S.E. not only to compel her to do work and punish her for perceived transgressions, they also assaulted her in order to force her to obtain prescription pain killers. On one occasion, Defendants concocted a scheme in which Dezerah Silsby, an indicted co-conspirator, smashed S.E.'s hand in a steel door and with a rock. Defendants then instructed S.E. to go to the emergency room and tell the doctor that she was injured when her daughter accidentally slammed a door. When S.E. returned from the hospital with two painkillers and a prescription for Vicodin, Defendants took the pills from her and sold the prescription to Brown. Another time, Callahan kicked S.E. in the hip with steel-toed boots, and Hunt ordered S.E. to go to the emergency room and tell the medical personnel that she slipped on a patch of ice and fell on a rock. S.E. did as she was told and again received a Vicodin prescription for her injury.

S.E.'s and B.E.'s ordeal ended more than two years after it began, when S.E. was caught shoplifting a candy bar at a local store. When the police offered to take S.E. home, she

expressed that she feared Hunt and Callahan, did not want to return home, and would rather go to jail.  When S.E. told the police that her daughter was at the apartment, an officer drove S.E. there to retrieve B.E.  When B.E. was removed from the home, officers reported that "her hair was patchy and thin, she had no muscle tone, her stomach was distended, her rib cage was sunken in, she had dark circles under her eyes, her skin was poor, she was dirty, and an unpleasant odor emanated from her body."  R. 188 at PGID 6390.

True to their word, Defendants showed the police the videos of S.E. beating B.E.  During the investigation into S.E., the police requested assistance from the FBI, which led to the prosecution of the instant case.

## II.     Procedural History

Based on the evidence recounted above, the jury convicted Defendants of conspiracy, in violation of 18 U.S.C. § 371 (Count I); forced labor, in violation of 18 U.S.C. §§ 1589(a) and 2 (Count II); and acquiring a controlled substance by deception, in violation of 21 U.S.C. § 843(a)(3) (Count IV).  In addition, the jury found that each forced labor violation included the offense of kidnapping or attempted kidnapping within the meaning of 18 U.S.C. § 1589(d).

Defendants filed motions for acquittal and for a new trial based on the sufficiency of the evidence and alleged legal errors committed by the district court.  The motions were denied in a lengthy opinion.  The district court then sentenced Callahan to concurrent terms of imprisonment as to each Count, with the longest term being 360 months for the forced labor violation.  Hunt also received concurrent terms of imprisonment for each Count, the longest of which was 384 months for her forced labor conviction.  Defendants timely appealed.

### DISCUSSION

We review *de novo* a district court's denial of a motion for a judgment of acquittal based on the sufficiency of the evidence.  *United States v. Eaton*, 784 F.3d 298, 304 (6th Cir. 2015). We do not "reweigh the evidence, reevaluate the credibility of witnesses, or substitute [our] judgment for that of the jury."  *Id.*  Rather, our job is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime" beyond a reasonable doubt.  *Id.*  "In sum, a defendant

claiming insufficiency of the evidence bears a very heavy burden." *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007).

We review a district court's denial of a motion for a new trial for abuse of discretion. *United States v. Kuehne*, 547 F.3d 667, 692 (6th Cir. 2008). A motion for a new trial can be premised on the argument that the "verdict was against the manifest weight of the evidence," and it can be premised on the argument that "substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). "When considering a motion for new trial based upon the weight of the evidence, district judges can act in the role of a 'thirteenth juror' and consider the credibility of the witnesses and the weight of the evidence." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). However, the court of appeals does not engage in this exercise. *Id.* We simply review the evidence and the district court's ruling, and we reverse only if we have "a definite and firm conviction" that the district court committed "a clear error of judgment." *Kuehne*, 547 F.3d at 692.

## I.        Forced Labor Convictions

The federal forced labor statute, 18 U.S.C. § 1589, was enacted as part of the Victims of Trafficking and Violence Prevention Act of 2000 (also known as the Trafficking Victims Protection Act). Defendants rely on the Act's legislative history to argue that § 1589 was passed to combat international trafficking in human beings and that Congress did not intend to criminalize the type of conduct charged in this case. They point out that § 1589 prosecutions have typically been directed toward those who hold undocumented immigrants for peonage or domestic service and those who hold individuals for the sex trade. Defendants also contend that the government, in the absence of jurisdiction and any compelling federal interest, usurped the prosecution of this "purely local" crime from state authorities.

The first question before the Court is whether Defendants' conduct is proscribed under § 1589. "To decide this question, we do not look first to the legislative history. Instead, we apply the well-known rule that statutory construction begins with the plain words of the statute." *United States v. Ransbottom*, 914 F.2d 743, 745 (6th Cir. 1990). Defendants were charged with violating § 1589(a). That provision of the forced labor statute provides:

(a) Whoever knowingly provides or obtains the labor or services of *a person* by any one of, or by any combination of, the following means—

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

> (2) by means of serious harm or threats of serious harm to that person or another person;

> (3) by means of the abuse or threatened abuse of law or legal process; or

> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

18 U.S.C. § 1589(a) (emphasis added).

The statute's express terms do not limit its application to immigrant victims or sex workers. Rather, § 1589(a)'s proscription against the exploitation of the labor or services of "a person" by prohibited means encompasses *any person*, no matter her nationality or place of birth. 18 U.S.C. § 1589(a). In other sections of the Act, Congress imposed limitations on the scope of prohibited conduct and the category of victims, *see, e.g.*, 18 U.S.C. § 1591 (prohibiting "[s]ex trafficking of children or by force, fraud, or coercion"), providing further indication that the unqualified term "a person" is purposefully broad.

Defendants are correct that "[w]hen construing a legislative enactment, [courts] must give effect to the intent of the legislature adopting the statute in question." *Chrysler Corp. v. C.I.R.*, 436 F.3d 644, 654 (6th Cir. 2006). But Defendants forget that "legislative intent should be divined first and foremost from the plain language of the statute," *Fieger v. U.S. Atty. Gen.*, 542 F.3d 1111, 1116 (6th Cir. 2008), and "reference to legislative history is inappropriate when the text of the statute is unambiguous." *Dep't of Hous. and Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002). Here, "a person" is unambiguous, as is the rest of § 1589(a). Thus, contrary to Defendants' suggestion, the charged activities in this case fall within the statute's ambit.

We are equally unpersuaded by Defendants' argument that because § 1589 prosecutions typically target those who exploit the unique vulnerabilities of foreign-born victims, the statute does not apply to those who exploit persons with other vulnerabilities, such as cognitive impairment. That restriction is not present in the statute, and in *United States v. Kozminski*,

487 U.S. 931, 953 (1988), the Supreme Court held that "the record contains sufficient evidence of physical or legal coercion to enable a jury to convict the [defendants]" of holding developmentally disabled men in involuntary servitude in violation of 18 U.S.C § 1584 (the predecessor to § 1589). We have analogous circumstances in this case.

Congress enacted § 1589 in response to *Kozminski* to expand the forms of coercion that could result in forced labor. *See United States v. Kaufman*, 546 F.3d 1242, 1261 (10th Cir. 2008) (citing H.R. Conf. Rep. No. 106–939, at 101). Thus, there is every indication that the statute allows for the prosecution of Defendants on the facts of this case.

Defendants also argue that any crime that occurred in this case is not a matter of federal concern. In an attempt to recast their first argument, Defendants rely on *Bond v. United States*, 134 S.Ct. 2077 (2014), and *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014), for the proposition that the underlying conduct in this case was not the type of forced labor that Congress intended to criminalize when it passed the Act.

In *Bond*, the defendant was prosecuted for possession and use of chemical weapons, in violation of 18 U.S.C. § 229(a), a provision of the Chemical Weapons Convention Implementation Act of 1998. 134 S.Ct. at 2083. The defendant, a microbiologist, discovered that her husband had a lover whom he had impregnated. In response, the wife obtained some toxic chemicals and spread them on various surfaces on the exterior of the girlfriend's home, mailbox, and car, in hopes that the paramour would injure herself by touching the chemicals. The chemicals were easy to see, however, and the girlfriend avoided touching them on all but one occasion. Postal inspectors set up surveillance cameras around the girlfriend's home and eventually caught the wife in the act. The § 229(a) prosecution followed.

The government argued that the wife's assault and attempted assaults fell within the broad scope of § 229 because a "toxic chemical" not used for a "peaceful purpose" (or other protected purpose) is statutorily defined as a chemical weapon. *See* 18 U.S.C. §§ 229F(1), (7)–(8). The Court rejected that argument and characterized the case as "an amateur attempt by a jilted wife to injure her husband's lover, which ended up causing only a minor thumb burn readily treated by rinsing with water." *Bond*, 134 S.Ct. at 2083. In reversing the conviction, the Court reasoned that § 229 was ambiguous due in part to the "improbably broad

reach of" the definition of chemical weapon and the "deeply serious consequences of adopting such a boundless reading." *Id.* at 2090. The Court cautioned against inferring congressional intent to criminalize activity traditionally regulated by the states, and construed the definition of chemical weapon narrowly because Congress did not clearly indicate that it intended "to treat a local assault with a chemical irritant as the deployment of a chemical weapon." *Id.* at 2093.

In *Toviave*, the defendant was prosecuted under § 1589, the same statute under consideration here. 761 F.3d at 623–25. The defendant brought four young relatives from Togo to live with him in Michigan, and he made them clean, cook, do laundry, and babysit. The defendant would beat the children with any readily accessible instrument if they misbehaved or failed to follow one of his rules. However, he was not always cruel to the children—he provided for the children by working two jobs and doing yardwork; he bought the kids sports equipment and allowed them to participate in recreational activities; they went on family vacations together; and he emphasized their education by hiring an English tutor, imposing mandatory study periods, making sure the children always attended school, and creating extra assignments and academic drills for the children to complete when their homework was finished. This Court reversed the defendant's conviction.

The panel held that though the defendant's behavior was reprehensible, it was not forced labor. The Court explained that "treating household chores and required homework as forced labor because that conduct was enforced by abuse either turns the forced labor statute into a federal child abuse statute, or renders the requirement of household chores a federal crime." *Id.* at 625.

This conclusion was reached with reliance on *Bond*. Without a clear expression of congressional intent, the panel declined to "transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores, or makes child abuse into a federal crime." *Id.* at 629. The Court made clear that its decision did not "undermine[] the reasoning of the forced labor decisions of this court and our sister circuits," where extreme isolation, threats and violence, and denial of access to education, were used to prevent the victims from leaving and to keep them bound to their captors. *Id.* at 629–30.

The circumstances of this case are markedly different from those in both *Bond* and *Toviave*. *Bond* dealt with a statute implementing an international treaty that was drafted as a result of the horrors of chemical weapon use by terrorists and warring nations. The Supreme Court concluded that Congress likely did not intend (and certainly did not explicitly state) that the provision covered a simple assault. In *Toviave*, we recognized that § 1589 was "passed to implement the Thirteenth Amendment against slavery or involuntary servitude." *Id.* at 629. The Thirteenth Amendment "was not intended to apply to exceptional cases well established in the common law at the time [of its passage], such as the right of parents and guardians to the custody of their minor children or wards." *Kozminski*, 487 U.S. at 944. We held that § 1589 did not proscribe the defendant's conduct in *Toviave* because "it has always been true that parents can make their children perform [household chores]," and the evidence showed that the defendant was otherwise concerned about the minors' well-being. 761 F.3d at 626.

To the contrary, Defendants' charged conduct in the instant case goes to the heart of § 1589's concern. As discussed more fully below, S.E. was compelled to perform domestic labor and run errands for Defendants by force, the threat of force, and the threat of abuse of legal process. Because this is a distinct harm that is a matter of federal concern pursuant to the Thirteenth Amendment, it matters little that Defendants' conduct may have also violated various state laws. Indeed, the circumstances of this case are analogous to the circumstances in many forced labor cases—squalid living conditions, extreme isolation, threat of legal process, and violence. *See id.* at 629–30 (collecting cases). Accordingly, we conclude that the acts proscribed by § 1589 encompass the conduct Defendants were charged with committing.

Defendants' next contention is that the government failed to show that S.E. provided labor or services in the manner contemplated by the statute. They claim S.E. performed the same cleaning duties that would be expected of any roommate.

"The term 'labor or services,' which is not defined by [§ 1589], is viewed in accord with its ordinary meaning." *United States v. Marcus*, 628 F.3d 36, 44 (2d Cir. 2010); *see also Kaufman*, 546 F.3d at 1261. Webster's Third New International Dictionary (1993) defines "labor" as "expenditure of physical or mental effort esp. when fatiguing, difficult, or compulsory;" and "service" is defined as "the performance of work commanded or paid for by

another." There was voluminous testimony that S.E. was constantly cleaning the apartment, running errands for Defendants, doing yardwork, and otherwise performing domestic tasks from morning until night. These tasks certainly constitute labor or service under the ordinary meaning of those words, and Defendants cite no authority for the proposition that household chores do not constitute labor or service under the statute. In *Toviave*, we held that a parent or guardian who requires children to perform household chores and also abuses the children does not necessarily violate the forced labor statute; we did *not* hold that household chores do not constitute labor or services. In sum, we agree with the district court's conclusion that there was substantial evidence from which a rational trier of fact could conclude that S.E. provided labor or services.

Defendants, in their last-ditch attempt to get their forced labor convictions reversed, argue that there was no evidence that any of the threats or force used against S.E. were employed for the purpose of obtaining S.E.'s labor, as required by § 1589.

Unfortunately for Defendants, this contention is belied by testimony from S.E. herself and a number of other witnesses. S.E. testified that she obeyed Hunt's orders to clean out of fear that Hunt might hurt her because Hunt had done so in the past. S.E. also testified that Hunt assaulted her when she would not clean quickly enough. Another witness testified to observing Hunt shoving S.E.'s face in dog excrement and yelling at her to clean it up. And there were numerous occasions when Defendants threatened or assaulted S.E. when she exceeded the time limit they imposed for running errands or when she bought things for herself.

Defendants enforced S.E.'s compliance to their demands in numerous other ways. They deprived S.E. and B.E. of food until S.E. completed the work they demanded. Defendants locked S.E. and B.E. in the basement from 8:00 p.m. until morning and would only let them out if S.E. performed the tasks she was assigned. Callahan forced S.E. to beat B.E. while he recorded it on his cellphone, and Defendants threatened to show the video to the police and Children's Services if S.E. talked to any strangers, went to her mom's house, or otherwise "messed up." These are but a few examples of the abuse Defendants inflicted on S.E. and B.E. to force S.E. to work and prevent S.E. and B.E. from leaving.

In sum, Defendants' conduct is proscribed by the forced labor statute and, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found

that the elements of the crime were met beyond a reasonable doubt.  Moreover, there was substantial evidence that Defendants knowingly coerced S.E. to provide labor and services.  We therefore affirm the district court's denial of Defendants' motions to acquit and for a new trial on Counts I and II.

## II.      Acquisition of a Controlled Substance by Deception Convictions

Defendants argue that the evidence submitted at trial was insufficient to sustain convictions for conspiracy to violate the deceptive acquisition of a controlled substance statute and the substantive offense itself because 21 U.S.C. § 843(a) does not proscribe their conduct.  They claim that intentionally injuring S.E. for the purpose of acquiring a prescription for pain medication is not criminalized by § 843(a) because the statute is targeted at healthcare professionals.  Defendants point to the legislative history of the statute for the proposition that the Act is regulatory in nature.

We again remind Defendants that this Court will not consult legislative history unless the statute is ambiguous.  *See United States v. Roman*, 2015 WL 4529437, at *3 (6th Cir. July 28, 2015).  Section 843(a) provides:

> It shall be unlawful for *any person* knowingly or intentionally—
>
> . . .
>
> (3) to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge[.]

21 U.S.C. § 843(a)(3) (emphasis added).

The express terms of the statute indicate that it applies to all persons who commit the offense, not just healthcare professionals.  And even if the Court were inclined to consult the legislative history of the statute as Defendants suggest, we would find "that Congress was concerned with the nature of the drug transaction, rather than with the status of the defendant." *United States v. Moore*, 423 U.S. 122, 134 (1975); *see also United States v. Wilbur*, 58 F.3d 1291, 1292 (8th Cir. 1995) ("The focus of [§ 843(a)(3)] is on *how* the defendant obtained the drugs." (internal quotation marks and alterations omitted)).  Moreover, one of the nine subsections of § 843(a) further qualifies "any person" with "who is a registrant" and none of the

other subsections are so limited. *See* 21 U.S.C. § 843(a)(1); *see also Moore*, 423 U.S. at 133–34. That the statute did specifically limit the scope of those eligible for punishment in some circumstances, and did not in others, indicates that "any person" truly means any person. Thus, we conclude that the charged activities in this case fall within the sweep of the statute.

There was also substantial evidence that Defendants' conduct actually violated § 843(a)(3). The jury was presented evidence that Defendants acquired Vicodin (a controlled substance) for their personal use by purposely injuring S.E. and then coaching her on the lies to tell medical personnel in order to be prescribed painkillers. S.E. was given Vicodin by a medical professional in the emergency room, and Defendants took it from her when she returned home, crushed and snorted the pills, and did not allow S.E. to take any of the medication. Defendants also took S.E.'s Vicodin prescription and kept it for themselves.

Defendants' argument that the government needed to present evidence that the hospital staff would have refused to provide painkillers to S.E. had they known the true circumstances of her injury is not well-taken. The argument boils down to an assertion that the statute requires but-for causation. True enough, at least three of our sister circuits have held that a defendant violates § 843(3)(a) only when he has made "a material misrepresentation, or committed fraud, deception, or subterfuge which was a *cause in fact* of the acquisition" of the controlled substance. *Wilbur*, 58 F.3d at 1292 (emphasis added) (alterations and citation omitted); *see also United States v. Adade*, 547 F. App'x 142, 146 (3d Cir. 2013); *United States v. Bass*, 490 F.2d 846, 857 n.11 (5th Cir. 1974) *overruled on other grounds by United States v. Lyons*, 731 F.2d 243 (5th Cir. 1984). But even assuming that but-for causation is required, the evidence presented at trial is sufficient to sustain Defendants' convictions.

There was testimony at trial that Vicodin is a controlled substance; S.E. was prescribed Vicodin for the injuries inflicted on her by Defendants; the prescription was filled at a local CVS pharmacy; Hunt picked up the Vicodin from CVS; and S.E. never received any of the medication that was prescribed to her. When Hunt picked up S.E.'s Vicodin from the pharmacy, one of two things happened: she either represented herself as S.E. or she represented that she was picking up the medication on behalf of S.E. In either case, she resorted to "trickery" to obtain the drug because she never gave the medicine to S.E. *See Willbur*, 58 F.3d at 1293. Callahan also

obtained the Vicodin through this misrepresentation.  Accordingly, we find that there was sufficient evidence for Defendants to be convicted of these offenses.

In sum, Defendants' conduct is proscribed by § 843(a)(3) and, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found that the elements of the crime were met beyond a reasonable doubt.

## III.      Pretrial Motion for Psychological Examination

We review a district court's decision denying a defendant's motion for a psychological examination of a witness for abuse of discretion.  *United States v. Ramirez*, 871 F.2d 582, 583 (6th Cir. 1989).

In the indictment, the government alleged that S.E. suffered from a "cognitive disability," and that Defendants exploited this fact to control her.  Callahan requested a psychological examination of S.E. to determine her competency to take the stand as a witness against him.  The district court denied the motion.  The court reasoned that as long as S.E. swore to tell the truth and understood the import of that obligation, then the jury could receive her testimony and give it whatever weight they thought it deserved.

Courts recognize that "[e]very person is competent to be a witness unless [the Federal Rules of Evidence] provide otherwise."  Fed. R. Evid. 601.  And courts know that they "cannot order a non-party witness to be examined by a psychiatrist." *Ramirez*, 871 F.2d at 584.  Instead, "[t]he most the court could do is condition such witness's testimony on a prior examination," *id.*, and we have cautioned that this power "should be exercised sparingly," *id.* at 585.  Courts also know that witness capacity is "particularly suited to the jury as [a question] of weight and credibility," and that "[d]iscretion is regularly exercised in favor of allowing the [witness to testify]."  Fed. R. Evid. 601, Advisory Committee Notes.

In this case, S.E. took an oath to testify truthfully, and the district court was satisfied that she understood that oath.  S.E. then testified for three days, providing the jury with a full opportunity to evaluate her capacity and credibility.  Considering these facts in the light of our decades-old precedent, we conclude that the district court did not abuse its discretion in denying Callahan's motion.

## IV.     Leading Questions on Direct Examination

Leading questions on direct examination are permitted when necessary to develop a witness' testimony.  Fed. R. Evid. 611(c).  It is the province of the trial court to make this necessity determination.  *Chonich v. Wayne Cnty. Cmty. Coll.*, 874 F.2d 359, 368 (6th Cir. 1989).  As an appellate tribunal, we review this decision for abuse of discretion.  *United States v. Shoupe*, 548 F.2d 636, 641 (6th Cir. 1977).

Here, the district court allowed the government to use leading questions during the direct examination of S.E. in order "to facilitate the progression of trial and avoid wasting time, to make S.E.'s testimony effective for determining the truth, and to protect S.E. from harassment and undue embarrassment to the extent possible . . . due to her cognitive impairment." [R. 188 at PGID 6409.]  Callahan argues that this was an abuse of discretion.

We can dismiss this assignment of error in short order.  First, there was evidence that S.E. was cognitively impaired, suffered a traumatic brain injury in a car accident, had "learning issues," and was receiving federal disability benefits due to "mental retardation."  Second, this Court has recognized that it can be appropriate to permit leading questions on the direct examination of a cognitively impaired witness.  *See Jordan v. Hurley*, 397 F.3d 360, 363 (6th Cir. 2005).  And most importantly, the district court gave the jury cautionary instructions about leading questions, assessing a witness' credibility, and the weight to give to testimony.  We therefore conclude that the district court did not abuse its discretion in permitting the government to ask S.E. leading questions.

## V.     Circumscribed Cross-Examination of Indicted Co-Conspirator

When a district court limits the scope of cross examination, we review that ruling for abuse of discretion.  *United States v. Obiukwu*, 17 F.3d 816, 821 (6th Cir. 1994).

"The Confrontation Clause of the Sixth Amendment guarantees a defendant an opportunity to impeach the credibility of a witness against him because impeachment is fundamental to effective cross-examination."  *United States v. Holden*, 557 F.3d 698, 704 (6th Cir. 2009).  But "this does not mean that the defendant is free to impeach a witness 'in whatever way, or to whatever extent the defense might wish.'"  *Id.* (quoting *Delaware v. Van Arsdall*,

475 U.S. 673, 679 (1986)).  "[T]rial judges retain wide latitude to impose reasonable limits on interrogation that is repetitive or only marginally relevant."  *Obiukwu*, 17 F.3d at 821.

"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness."  *Van Arsdall*, 475 U.S. at 680 (internal quotation marks omitted).  "The key issue is whether the jury had enough information to assess the defense's theory of the case despite the limits placed on cross-examination."  *Holden*, 557 F.3d at 704.  "So long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination."  *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998); *accord United States v. Fields*, 763 F.3d 443, 464 (6th Cir. 2014).

Indicted co-conspirator Brown testified against Defendants in this criminal trial.  During cross-examination, Hunt's counsel wanted to question Brown about the fact that he was originally charged with the substantive count of forced labor, but his plea agreement only included a conspiracy charge.  Brown faced significantly more time in prison on the forced labor charge than he faced on conspiracy charge.  Hunt's counsel wanted to get across to the jury that Brown had a strong incentive to lie.

The district court did not allow Hunt's counsel to ask Brown about "a charging decision over which Brown had no control" because the court believed "[t]hat line of questioning would have obviously and, perhaps intentionally, elicited irrelevant, prejudicial, and confusing testimony that would not have been based on Brown's personal knowledge."  R. 188 at PGID 6422.  More specifically, the court did not allow inquiry into *why* he was charged with the conspiracy charge as opposed to the substantive offense.

The court *did* allow Hunt's counsel to ask Brown about whether he was facing more time under the substantive forced labor charge as opposed to the conspiracy charge.  The court also permitted counsel to ask whether Brown expected a reduced sentence as a result of his cooperation.  And defense counsel did cross-examine Brown about a variety of impeaching

information, including his past drug abuse; his prior conviction for child endangerment in which Defendants testified against him; his plea agreement with the government in this case; that he and Callahan sold drugs together and Brown believed Callahan was unfair to him; and the nature of his prior, intimate relationship with S.E.  Based on this array of impeaching information, we are "hard-pressed to conclude that the jury was not otherwise in possession of sufficient information concerning formative events to make a discriminating appraisal of the witness' motives and bias." *Fields*, 763 F.3d at 464–65.

## VI.    Kidnapping Jury Instruction and Special Verdict Form

"We review jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *United States v. Mack*, 159 F.3d 208, 218 (6th Cir. 1998).  "A refusal to give requested instructions is reversible error only if (1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and [(3)] the failure to give the instruction impairs the defendant's theory of the case." *United States v. Hargrove*, 416 F.3d 486, 489 (6th Cir. 2005) (internal quotation marks omitted).  Plain error review applies here because Defendants did not "contemporaneously object" to the instructions.  *United States v. Adams*, 214 F.3d 724, 728 (6th Cir. 2000).  "Plain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *Id.* at 729.

> The relevant subsection of the forced labor statute states:
>
> Whoever violates this section shall be fined under this title, imprisoned not more than 20 years, or both. If death results from a violation of this section, or if the violation includes kidnaping, an attempt to kidnap, aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title, imprisoned for any term of years or life, or both.

18 U.S.C. § 1589(d).  This subsection provides that the maximum potential penalty for violation of the statute is twenty years of incarceration, but if any of the specified acts occurred during the underlying violation, then the maximum term of imprisonment is life.  As a statutory sentencing enhancement, the government was required to prove beyond a reasonable doubt that a kidnapping, an attempt to kidnap, aggravated sexual abuse, or an attempt to kill was part of the

forced labor offense. The government sought to prove that Defendants kidnapped S.E. when they forced her to work for them.

The district court submitted a special verdict form to the jurors (along with the jury instructions) on which they could render their verdict as to the kidnapping enhancement. Defendants argue that the district court's instructions were erroneous for two reasons: (1) they did not indicate that the kidnapping had to be proved beyond a reasonable doubt, and (2) there was no place for the jurors to mark "not guilty." We consider these arguments in turn.

#### A.      Reasonable Doubt

The district court instructed the jury:

> For Count 2, if you find that the government has proved each of the offense elements *beyond a reasonable doubt* as to one or both of the defendants, you will next be asked to consider whether the offense as to each such defendant included kidnapping.

> For purposes of this case, "kidnapping" means to restrain and confine a person by force, intimidation, or deception with the intent to terrorize or cause bodily injury to that person; or to restrain a person's liberty in circumstances that create a substantial risk of bodily harm to that person. If you find that a defendant engaged in any of the conduct I have just described with respect to S.E. or B.E., you may find the offense -- the charged offense included kidnapping.

R. 158 at PGID 5731–32 (emphasis added). Defendants argue that the district court erred by failing to specify that the jurors had to find that the government proved kidnapping beyond a reasonable doubt. We disagree.

Viewing the instructions as a whole, it is evident that the jury was instructed that their findings had to be made beyond a reasonable doubt. The court instructed them: "Your second duty is to take the law that I give you, apply it to the facts, and decide if the government has proved defendant guilty beyond a reasonable doubt," R. 158 at PGID 5688; The "presumption of innocence stays with the defendant unless the government presents evidence here in court that overcomes the presumption, and convinces you beyond a reasonable doubt that he or she is guilty," *id.* at PGID 5689–90; "It is up to the government to prove that a defendant is guilty, and this burden stays on the government from start to finish. You must find a defendant not guilty unless the government convinces you beyond a reasonable doubt that he or she is guilty, *id.* at

PGID 5690; "The government must prove every element of the crimes charged beyond a reasonable doubt," *id.*; "To find defendants guilty, every one of you must agree that the government has overcome the presumption of innocence with evidence that proves his or her guilt beyond a reasonable doubt," *id.* at PGID 5749. There was no reference to any other burden of proof throughout trial, and nothing in the record suggests the jury believed that the standard of proof for the special verdict form was anything other than the same standard on which the district court repeatedly instructed them.

Certainly the kidnapping instruction would have been more complete if the district court had again mentioned the reasonable doubt standard. "The instructions as given and taken as a whole, however, were not so confusing, misleading, or prejudicial as to cause a grave miscarriage of justice." *Mack*, 729 F.3d at 605.

**B.      Special Verdict Form**

Defendants argue that the district court erred by failing to provide a written "not guilty" or "none of the above" option on the forced labor special verdict form. However, as the government points out, this argument is waived.

When Defendants raised this issue before the district court (after the jurors had already begun deliberating), the government suggested polling the jury to clarify their findings if they returned a guilty verdict on the forced labor charge. Callahan's counsel agreed with that suggestion, and Hunt's counsel did not object. Based on that discussion, the court explained that it would not modify the special verdict form, and instead would clarify the instructions for the jury if they had any questions. The jury returned guilty verdicts for Defendants on the forced labor charge and found the kidnapping aggravator. The court polled the jury and asked each juror whether he found that each Defendant had committed the proscribed act as marked on the special verdict form. Defense counsel said they were satisfied with that polling. Thus, Defendants cannot now claim that the special verdict form was unclear. *See United States v. Smith*, 749 F.3d 465, 494–95 (6th Cir. 2014) ("defense counsel's agreement with the judge's proposed course of conduct waived his claim on this issue" (internal quotation marks omitted)).

**VII.    Procedural and Substantive Reasonableness of the Sentences**

"[W]e review the reasonableness of a sentence under the deferential abuse-of-discretion standard." *United States v. Zobel*, 696 F.3d 558, 566 (6th Cir. 2012). This deferential standard is comprised of two parts: procedural soundness and substantive reasonableness. *United States v. Herrera-Zuniga*, 571 F.3d 568, 581 (6th Cir. 2009). "In reviewing for procedural reasonableness, a district court abuses its discretion if it commits a significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *United States v. Johnson*, 640 F.3d 195, 201–02 (6th Cir. 2011) (internal quotation marks omitted). "In reviewing for substantive reasonableness, we must consider the sentence imposed in light of the totality of the circumstances." *Id.* at 202 (internal quotation marks omitted). "A sentence is substantively unreasonable if the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor." *United States v. Kirchhof*, 505 F.3d 409, 413 (6th Cir. 2007) (internal quotation marks omitted). "[A] sentence that is within the advisory guidelines range . . . is accorded a rebuttable presumption of reasonableness." *Id.* at 414.

**A.    Defendant Callahan**

Callahan argues that his sentence is unreasonable because his alleged conduct is not criminalized by §§ 1589(a) and 843(a)(3), and therefore the district court had no authority to sentence him to any term of confinement. As discussed above, Callahan was properly convicted of Counts I, II, and IV.

Callahan's single mention of "disproportionality" with respect to his sentence in the title of his argument is waived because he offered no further discussion on the issue. *See United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

**B.** **Defendant Hunt**

Hunt argues that the district court erred in calculating her Guidelines sentence. The court increased Hunt's base offense level by several points to account for specific offense characteristics related to the forced labor charge. The Sentencing Guideline applicable for violation of 18 U.S.C § 1589 is U.S.S.G. § 2H4.1. Hunt also argues that her sentence is disproportionally greater than that of other defendants who have been sentenced for violating the forced labor statute.

Hunt contends that no additional points should have been added to her base offense level for: (1) "serious bodily injury" under § 2H4.1(b)(1)(B) because the smashing of S.E.'s hand by Silsby was done as part of the group's desire for pain medication in relation to the 21 U.S.C. § 843(a)(3) charge; (2) use of "a dangerous weapon" under § 2H4.1(b)(2)(A) because no dangerous weapon was used during the offense and any handling of a firearm was done outside of her presence and thus not reasonably foreseeable; (3) "peonage or involuntary servitude for . . . more than one year" under § 2H4.1(b)(3)(A) because there was not sufficient evidence showing that S.E. was kept in that condition for the requisite amount of time; and (4) the "other felony offense" of kidnapping under § 2H.41(b)(4).

The district court properly applied a two-level enhancement under § 2H4.1(b)(1)(B) because S.E. sustained "serious bodily injury" while in a condition of forced labor. "Serious bodily injury" is defined as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, n.1(L). There was significant evidence at trial that S.E. sustained serious bodily injury in connection with her condition of forced labor: Hunt beat S.E. with a wooden fence post upon discovering S.E. had taken food to feed B.E.; Hunt punched S.E. in the face when S.E. bought an item that was not on the shopping list; Callahan kicked S.E. in the face and knocked her tooth loose after he learned about her note discussing escape plans. Each of these events caused S.E. extreme physical pain and therefore the district court properly applied the two-level enhancement.

The district court properly applied a four-level enhancement under § 2H4.1(b)(2)(A) because a "dangerous weapon was used" during the commission of the forced labor offense. "A

dangerous weapon was used" means "that a firearm was discharged, or that a firearm or other dangerous weapon was otherwise used." U.S.S.G. 2H4.1, n.1. Any "instrument capable of inflicting death or serious bodily injury" and any "object that is not an instrument capable of inflicting death or serious bodily injury but . . . closely resembles such an instrument," qualifies as a "dangerous weapon." U.S.S.G. § 1B1.1, n. 1(D). This Court employs a "functional approach" to "what constitutes a dangerous weapon" under the Guidelines, and we have recognized that "in the proper circumstances, almost anything can count as a dangerous weapon, including walking sticks, leather straps, rakes, tennis shoes, rubber boots, dogs, rings, concrete curbs, clothes irons, and stink bombs." *United States v. Tolbert*, 668 F.3d 798, 802–03 (6th Cir. 2012).

In this case, Hunt used a fence post to beat S.E., which qualifies as a dangerous weapon under the circumstances. Because Defendants were both convicted of conspiracy, Hunt was equally culpable for her co-conspirator's acts in furtherance of the conspiracy. *See United States v. Ward*, 506 F.3d 468, 474 (6th Cir. 2007) (finding for purposes of a firearm enhancement that "[p]ossession of a firearm by a co-conspirator is attributable to any other conspirator if the co-conspirator's possession was reasonably foreseeable"). And there were at least two occasions when Callahan pointed a gun at S.E. and B.E., and one occasion when Callahan threatened S.E. with a knife while questioning her about who she talked to and why she took so long to run an errand. Accordingly, the district court properly applied the four-level use-of-a-dangerous-weapon enhancement.

The district court properly applied a three-level enhancement for "peonage or involuntary servitude for . . . more than one year" under § 2H4.1(b)(3)(A). The record supports the finding that S.E. was held in a condition of involuntary servitude from at least the spring of 2011 when Defendants began keeping S.E. locked in the basement (and then later a room upstairs) until S.E. was arrested by the police for shoplifting in October 2012. Thus, the three-level enhancement was warranted.

The district court properly applied a ten-level enhancement for "other felony offense" under § 2H4.1(b)(4)(B). The provision states, "If any other felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense,

increase to the greater of . . . 2 plus the offense level from the offense guideline applicable to that other offense, but in no event greater than level 43."  U.S.S.G. § 2H4.1(b)(4)(B).  Under subsection (b)(4), "'any other felony offense' means any conduct that constitutes a felony offense under federal, state, or local law (other than an offense that is itself covered by this subpart).  When there is more than one such other offense, the most serious such offense . . . is to be used."  *Id.* at n.2.  The jury's special verdict concluded that the forced labor offense involved kidnapping so Hunt's most serious underlying offense is kidnapping, which is governed by Guideline § 2A4.1.

Defendant Hunt argues that the cross-reference to kidnapping does not apply because she was not charged with kidnapping.  She also argues that the inclusion of the specific offense characteristics (*i.e.*, serious bodily injury, use of a dangerous weapon, length of confinement) under the kidnapping calculation resulted in impermissible double counting.  We disagree.

First, Hunt need not have been convicted under the federal kidnapping statute for § 2A1.4 to apply because cross-referencing "is not limited to 'offenses charged in the indictment or that resulted in a conviction.'"  *United States v. Grimes*, 348 F. App'x 138, 140 (6th Cir. 2009) (quoting *United States v. Cowan*, 196 F.3d 646, 649 (6th Cir. 1999)); *see also United States v. Cooper*, 739 F.3d 873, 884 (6th Cir. 2014).  Because the most serious "other felony offense" that Hunt committed in connection with her forced labor violation was kidnapping, and the jury unanimously found that her conduct involved kidnapping, the district court properly applied § 2A4.1.

Second, no impermissible double counting actually occurred in Hunt's case.  As this Court explained in *United States v. Walters*, 775 F.3d 778 (6th Cir. 2015):

> Double counting occurs when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways. No double counting occurs if the defendant is punished for distinct aspects of his conduct. Where double counting does occur, however, it may be permissible. Where it appears that Congress or the Sentencing Commission intended to attach multiple penalties to the same conduct, double counting is permitted. Indeed, the Guidelines explicitly state that the offense level adjustments from more than one specific offense guideline are applied cumulatively (added together) unless otherwise noted.

*Id.* at 782 (internal citations, alterations, and quotation marks omitted). Section 2H4.1(b)(4) instructs courts to calculate the offense level for "other felony offense" during the forced labor violation before adding two additional levels to the greater of the forced labor calculation or to the other felony offense calculation. In applying the kidnapping cross-reference, the district court added the specific offense characteristic enhancements to determine whether the kidnapping calculation or the forced labor calculation was higher before applying the two-level enhancement mandated by § 2H4.1(b)(4). The kidnapping calculation, being the higher of the two, essentially replaced the forced labor calculation, and therefore Hunt's conduct was not counted twice in her ultimate sentence. The district court's application of the cross-reference was proper.

Hunt's last argument is that her 384-month sentence is much greater than other sentences imposed for violation of § 1589. In support of the argument, she points to three forced labor cases where the defendant was sentenced to a shorter period of imprisonment.

"[W]e have criticized the comparison of the defendant's sentence to those imposed in other singular cases as weak evidence to show a national sentencing disparity." *United States v. Rossi*, 422 F. App'x 425, 435 (6th Cir. 2011). And, as previously discussed, "this Circuit applies a rebuttable presumption of reasonableness to sentences that are within a properly calculated Guidelines range." *United States v. Recla*, 560 F.3d 539, 549 (6th Cir. 2009).

Here, Hunt's Guideline sentence for the forced labor charge was life imprisonment, and the district court varied downward and sentenced her to a 384-month term of confinement. The court appropriately considered aggravating factors, including that Hunt provided untruthful testimony at trial on several material issues; that S.E. has permanently lost custody of her daughter because of Hunt's conduct; that Hunt's use of her children to harm S.E. and B.E. was deplorable; and that Hunt inflicted physical abuse upon the victims. The court also took into account the mitigating factors, including that Hunt had a tough upbringing, a history of substance abuse, was under-educated, and had also lost custody of her children. The district court considered the 18 U.S.C. § 3553(a) factors and imposed what it believed to be an appropriate sentence. Hunt has pointed to nothing that indicates that the district court erred in varying

downward from her Guidelines range of imprisonment such that her sentence was substantively unreasonable.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.