NOT RECOMMENDED FOR PUBLICATION
File Name:  18a0213n.06

No. 17-5282

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Apr 25, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| JOHN GUZMAN, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| | ) | |

BEFORE:  CLAY, STRANCH, and LARSEN, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**  John Guzman was convicted by a jury of nine counts of bank fraud, in violation of 18 U.S.C. § 1344.  The district court imposed a sentence of 50 months of imprisonment for each count, to be served concurrently.  Guzman challenges his convictions, arguing that the district court erred in denying his motion for a judgment of acquittal.  Because we find that Guzman's convictions are supported by the evidence, we **AFFIRM**.

## I.    BACKGROUND

In 2006, Guzman owned and managed several Kentucky businesses, including a houseboat rental business.  Guzman wished to purchase the Grider Hill Marina on Lake Cumberland, which was priced at $15 to $17 million.  Initially, Guzman approached American Founders Bank (AFB) for a loan but he was denied financing because of large outstanding debts

that he owed to AFB for his various business ventures. Guzman then approached Fifth Third Bank, which agreed to finance the project provided that Guzman could supply a $5 million down payment on the property. To secure this down payment, Guzman recruited five individuals— Brent Ray, Eric Friedlander, William "Bill" Bigelow, Robert Dames, and Richard Markowitz— to purchase shares in Guzman's marina endeavor. Guzman informed these investors that to finance the purchase of the marina, he would assist them in obtaining loans from AFB. Guzman prepared loan applications on behalf of the investors, AFB approved the applications, and Guzman secured a total of $2.1 million for the down payment on the marina. Unbeknownst to Guzman's investors, however, the loan applications submitted to AFB stated that the purpose of each loan was to purchase a houseboat or materials to build a houseboat. In support of these loan applications, Guzman furnished AFB with fake houseboat appraisals, insurance paperwork, and boat surveys that he created using documentation from houseboats in his rental fleet. These loan applications in no way indicated that the purpose of these loans was to secure financing for the marina purchase. This scheme and the accompanying falsified loan documents for each of the five investors were the basis for Counts One through Five of the indictment.

The remaining four counts of the indictment were linked to Guzman's other business interests. Guzman and his brother Glenn jointly managed Driftwood Floating Condos (Driftwood). Glenn died suddenly in August 2006. Two months later, Guzman forged his brother's signature in order to cash in a certificate of deposit and pay down Driftwood's line of credit with AFB. Following that payment, AFB raised Driftwood's line of credit, and Guzman transferred corresponding funds to accounts utilized for financing his purchase of Grider Hill Marina. Guzman's transfer of the line of credit funds formed the factual basis for Count Six of the indictment.

Guzman also approached professional football player Kimo Von Oelhoffen, a partner in another of Guzman's businesses, about financing the marina. After Von Oelhoffen declined to participate in the marina deal, Guzman represented himself as holding Von Oelfoffen's power of attorney and transferred $500,000 from Von Oelhoffen's money market account to AFB to pay down the line of credit on their joint business venture. When AFB consequently increased the line of credit of his business with Van Oelhoffen, Guzman immediately transferred $500,000 from that business to accounts for the marina closing. This conduct constituted the basis for Count Seven of the indictment.

At the time he purchased Grider Hill Marina, Guzman also ran a company called Able To Loan with his partner Larry Frakes. Able To Loan facilitated loans to investors seeking to build houseboats and modular housing by having banks such as AFB underwrite these loans. Among Able To Loan's projects was a loan to investors to build an assisted living facility in West Virginia, which would be built in multiple phases. In November 2006, prior to the purchase of the marina, Able To Loan borrowed $643,400 from AFB and distributed it to the investors building the assisted living facility. According to Frakes's testimony, Guzman forged Frakes's signature as guarantor of the loan. That phase of construction was subsequently completed and the investors paid back Able To Loan. Able To Loan, in turn, repaid the balance owed to AFB.

In March 2007, AFB agreed to underwrite the second portion of Able To Loan's loan to the investors building the assisted living facility. Guzman again forged Frakes's signature. In this instance, however, Guzman diverted $651,897.34 to his Grider Hill Marina endeavor and never repaid AFB the balance due for underwriting the second disbursement to the assisted living investors. These two incidents are the basis for Counts Eight and Nine of the indictment.

After a five-day jury trial, a jury convicted Guzman on all charges. Guzman moved for a judgment of acquittal, which the district court denied. He filed a timely notice of appeal. Guzman challenges his convictions on Counts One through Five and Counts Eight and Nine only.

## II.     STANDARD OF REVIEW

"We review *de novo* a district court's denial of a motion for a judgment of acquittal based on the sufficiency of the evidence." *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015). Under this standard, the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We draw all reasonable inferences in support of the jury's verdict and may reverse a judgment only if it is not supported by substantial and competent evidence, viewing the record as a whole. *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 79 (2016). "[A] defendant claiming insufficiency of the evidence bears a very heavy burden." *Callahan*, 801 F.3d at 616 (quoting *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007)).

## III.     ANALYSIS

At the outset, we clarify that Guzman was convicted under 18 U.S.C. § 1344(1), and not under the provisions of § 1344(2). Section 1344(1) prohibits an individual from knowingly executing or attempting to execute a scheme or artifice to defraud a financial institution. Section 1344(2) prohibits any scheme "to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(2).

The indictment states that all nine counts are for violations of Section 1344(1). The jury instructions, likewise, confirm that the jury was instructed under the provisions of Section 1344(1).

Guzman argues that there was insufficient evidence to convict him of bank fraud under Section 1344(1). "The elements of bank fraud under 18 U.S.C. § 1344 are: (1) the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) the defendant had an intent to defraud, and (3) the financial institution was insured by the FDIC." *United States v. Kerley*, 784 F.3d 327, 343 (6th Cir. 2015) (citations and internal quotation marks omitted). The fraud perpetrated by the defendant must involve the concealment or misrepresentation of a material fact. *Neder v. United States*, 527 U.S. 1, 22–23 (1999). Because a challenge to the district court's denial of a motion for a judgment of acquittal is in essence a challenge to the sufficiency of the evidence, *Callahan*, 801 F.3d at 616, we will review each of Guzman's convictions in turn to determine whether each was "supported by substantial and competent evidence upon the record as a whole." *Vichitvongsa*, 819 F.3d at 270 (quoting *United States v. Stewart*, 729 F.3d 517, 526 (6th Cir. 2013)).

## A. Counts One through Five: Falsifying Investors' Loan Applications

Counts One through Five alleged a scheme under which Guzman recruited investors for his marina purchase and made loan applications to AFB, falsely claiming that the investors were seeking financing to purchase or construct houseboats. The Government presented extensive evidence documenting Guzman's scheme to defraud AFB. Jim Tate, who served as Senior Loan Officer at AFB during the times at issue, testified that he and Guzman devised a plan whereby Guzman would secure the down payment he needed to close the marina deal with Fifth Third Bank by executing several smaller loans with AFB. Tate testified that Guzman submitted loan

documents purporting to be for houseboat purchases but which were intended to secure financing for Guzman's Grider Hill Marina purchase. Tate explained that Guzman would submit false appraisal and insurance documents and that in some cases, Tate witnessed Guzman forging the signature of unwitting loan recipients.

Each of the unwitting investors testified at trial. All five identified loan documents that they had not authorized, were forged, or that referred to nonexistent collateral. The five investors' testimony demonstrated that Guzman recruited them to purchase shares in the marina and directed them to AFB for financing.

The Government also called John Davis, the former Chief Credit Officer at AFB, who identified loan agreements corresponding to AFB-issued loans to each of the five investors. Davis testified that at the time the loans were issued, AFB understood that the purpose of these loans was to secure financing for the purchase of a mobile home or houseboats. Davis testified that had the bank known the information contained in the loan applications was false, it would have materially impacted AFB's lending decisions. Davis also testified that AFB was unaware that Tate was engaged in fraud, that he did not possess legal authority to bind the bank to these fraudulent transactions, and that AFB had not authorized the acceptance of fraudulent documents. Davis also testified that AFB was insured by the Federal Deposit Insurance Corporation (FDIC) throughout its existence and the Government introduced exhibits demonstrating that AFB was FDIC insured.

Examining this evidence in the light most favorable to the prosecution, we conclude that there was sufficient evidence to find all of the elements of bank fraud. *See United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007). Tate's testimony established that he and Guzman "knowingly executed . . . a scheme to defraud" AFB. *Kerley*, 784 F.3d at 343. The testimony of

the individual investors demonstrated that Guzman intentionally designed this scheme to falsify the existence of collateral and to obscure the purpose for which the funds would be used. Davis's testimony established that the documents underlying each of the loans for the individual investors misrepresented material facts that were crucial to the bank's evaluation of the loans. *See Neder*, 527 U.S. at 22–23. Finally, Davis's testimony also established that AFB was a FDIC-insured institution. *See Kerley*, 784 F.3d at 343.

Guzman repeatedly contends that the Government failed to demonstrate that he intended to defraud any of the investors. Guzman misapprehends the bank fraud statute, which requires only that Guzman intended to defraud a bank, in this case, AFB. *See* 18 U.S.C. § 1344(1).

Guzman also argues that the Government "failed to show that Guzman place [sic] AFB at a risk of lost [sic]." This argument also misses the mark. "[W]e definitively held that 'to have the specific intent required for bank fraud the defendant need not have put the bank at risk of loss in the usual sense or intended to do so.'" *United States v. Warshak*, 631 F.3d 266, 313 (6th Cir. 2010) (quoting *United States v. Everett*, 270 F.3d 986, 991 (6th Cir. 2001)). As the Supreme Court made clear, the federal bank fraud statute "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Shaw v. United States*, 137 S. Ct. 462, 467 (2016). In short, the Government offered more than sufficient evidence of Guzman's guilt with respect to Counts One through Five to support the jury's verdict.

### B. Counts Eight and Nine: Able To Loan Frauds

Counts Eight and Nine related to Guzman's operation of Able To Loan and that business's venture to convert manufactured homes into an assisted living facility in West Virginia. Able To Loan secured a $643,400 loan from AFB and used that loan to finance Housing Innovations, which was the company contracted to construct the Midland Meadows

assisted living facility in West Virginia. Midland Meadows had already secured a commercial mortgage from Chase Bank, which it used to pay Housing Innovation once the project was completed. At the conclusion of the first phase of construction, Chase Bank paid Housing Innovations the balance due for its work, and Housing Innovations ultimately repaid the balance of the $643,400 loan with AFB. Able To Loan secured the initial loan, however, through the personal guarantee of Larry Frakes. Frakes testified that he never signed the personal guarantee on this loan and that he did not understand he was personally liable for the loan. Furthermore, Davis of AFB testified that Frakes's signature was in Guzman's handwriting. Davis also testified that the authenticity of a personal guarantee on a loan was material to AFB's lending decision regardless of whether AFB ultimately recouped the balance of the loan.

In March 2007, AFB agreed to underwrite the second part of Able To Loan's loan to complete the Midland Meadows assisted living facility, this time for approximately $652,000. Davis once again testified that the loan documents included a personal guarantee purportedly signed by Larry Frakes, but which Davis believed was actually signed by Guzman. Davis also testified that, as it pertained to the transactions in Count Nine, the authenticity of a personal guarantee was material to AFB's decision to lend to Able To Loan. Frakes testified that he never signed the personal guarantee and did not recognize the signature on the document as his own.

In this instance, the evidence also demonstrated that Guzman diverted $500,000 to his Grider Hill Marina purchase. Patrick Collins, an investigator for the FDIC, reviewed the transactions involved in Count Nine and determined that instead of AFB sending the funds to Able to Loan, in this case the loan went directly from AFB to Housing Innovations. Collins testified that on the same day the loan was received by Housing Innovations, a $500,000 check was written and deposited to Guzman's account for the marina project at Fifth Third Bank.

When Housing Innovations completed construction on the Midland Meadows project, Chase Bank again distributed funds pursuant to its lending agreements with the West Virginia entities and paid Housing Innovations for the construction services. Although Housing Innovations received funds designated to repay the loan, AFB was never paid back.

When presented with a challenge to the sufficiency of the evidence, "[o]ur task is to determine 'whether, after viewing the evidence in the light most favorable to the prosecution, and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony, any rational trier of fact could find the elements of the crime beyond a reasonable doubt.'" *United States v. Ross*, 502 F.3d 521, 529 (6th Cir. 2007) (quoting *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588–89 (6th Cir. 1999) (citing *Jackson*, 443 U.S. at 319)). The Government demonstrated the existence of a scheme to defraud AFB through the testimony of Davis and Frakes. Their testimony regarding Guzman's forgeries was sufficient to demonstrate that Guzman had the intent to defraud AFB. *See United States v. Moede*, 48 F.3d 238, 242 (7th Cir. 1995) (holding that forged signatures create evidence of intent to defraud, sufficient to sustain convictions for bank fraud); *see also United States v. Hoglund*, 178 F.3d 410 (6th Cir. 1999) (affirming a conviction for bank fraud involving forgeries). Davis again testified that the forged personal guarantee was material to the lending decision and demonstrated that Guzman knowingly misrepresented the true nature of this transaction to AFB. *See Neder*, 527 U.S. at 22–23. These acts were sufficient to sustain a conviction for bank fraud under the statute. When considered in conjunction with the testimony demonstrating that Guzman diverted the loan proceeds to his Grider Hill Marina account, the evidence of Guzman's guilt is more than sufficient to support the jury's verdict.

**IV.      CONCLUSION**

For the reasons stated above, we **AFFIRM** the district court's denial of Guzman's motion

for a judgment of acquittal.